**IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF PENNSYLVANIA**

| | | |
|---|---|---|
| FFC PARTNERSHIP LP, FINE FAMILY | ) | |
| LIMITED PARTNERSHIP, MF | ) | Civil Action No. 08-1691 |
| INVESTMENT FUND, LP, AND FINE | ) | |
| CAPITAL ASSOCIATES, LP, | ) | |
| | ) | Judge Nora Barry Fischer |
| Plaintiffs, | ) | Magistrate Judge Lisa Lenihan |
| | ) | |
| vs. | ) | |
| | ) | |
| ROSEN CAPITAL PARTNERS, LP, | ) | Doc. No. 4 |
| ROSEN CAPITAL MANAGEMENT, | ) | |
| LLC, KYLE ROSEN AND PANOPTIC | ) | |
| FUND ADMINISTRATION LLC, | ) | |
| | ) | |
| Defendants. | ) | |

## REPORT AND RECOMMENDATION

I.    RECOMMENDATION

It is respectfully recommended that the Motion to Compel Arbitration and to Dismiss at Doc. No. 4 be granted in part and denied in part.  It is recommended that the Motion to Compel Arbitration be granted and that Plaintiffs be ordered to arbitrate against all four Defendants.  It is further recommended that the Motion to Dismiss be denied, but that the case be stayed and administratively closed.

II.    REPORT

A.    Relevant Facts

The Plaintiffs in this case are FFC Partnership, LP ("FFC"), Fine Family Limited Partnership ("Fine FLP"), MF Investment Fund, LP ("MFIF"), and Fine Family Capital Associates, LP ("Fine FCA") (collectively, the "Plaintiffs").  All Plaintiffs are limited partnerships formed under the laws

of Delaware, with their principal offices located in Pittsburgh, Pennsylvania, and each of the limited partnerships conducts business in Allegheny County, Pennsylvania.

Defendant, Rosen Capital Partners, LP ("RCP") is a Delaware limited partnership with its principal offices in Santa Monica, California. Defendant, Rosen Capital Management, LLC ("RCM") is a Delaware limited liability company with its principal offices located in Santa Monica, California. Defendant, Kyle Rosen is the owner, president, and managing member of RCM and who in that capacity, controls the management of RCP (collectively, the "Rosen Defendants"). Defendant, Panoptic Fund Administration, LLC ("Panoptic") is a limited liability company with its principal offices in El Segundo, California.[1]

On or about May 1, 2008, FFC invested $1,000,000.00 in RCP through the purchase of a limited partnership interest in RCP. (Doc. No. 1-2 ¶ 12.) Pursuant to this investment, FFC, RCP, and RCM entered into an agreement (hereinafter "Side Agreement(s)") which provided certain terms and made certain material representations with regard to FFC's investment, and in particular, the withdrawal of Plaintiffs' investment. (*Id.* at ¶ 13.)

On or about July 28, 2008, Defendants[2] sold to Plaintiffs, Fine FLP, MFIF, and Fine FCA, limited partnership interests totaling $2,000,000.00 in RCP. (*Id.* at ¶ 14.) Pursuant to that investment, Plaintiffs and Defendants RCP and RCM entered into Side Agreements, which provided certain terms and made material representations in regard to the withdrawal of Plaintiffs' investment. (*Id.* at ¶ 15.)

On or about October 7, 2008, Plaintiffs requested a withdrawal of their investments in RCP.

_____

[1] The term "Defendants" collectively refers to the Rosen Defendants and Panoptic.

[2] Plaintiffs, throughout their complaint, refer to Defendants collectively, and do not designate which Defendant sold the investment in RCP to them.

(*Id.* at ¶ 16.)   In response to such request, the Defendants acknowledged and agreed to the withdrawal of the Plaintiffs' investments but did not take immediate action.  The Plaintiffs aver that the Defendants' alleged failure to immediately withdrawal Plaintiffs' investments resulted in a loss in excess of 85% of Plaintiffs' initial $3,000,000.00 investment. (*Id.* at ¶¶ 18-19.)

On November 14, 2008, Plaintiffs filed civil action No. GD-08-24403 in the Court of Common Pleas of Allegheny County. (Doc. No. 1.)  On December 10, 2008, Defendants RCP, RCM, and Panoptic timely removed the action to federal court invoking this Court's federal question jurisdiction pursuant to 28 U.S.C. § 1331, in that Plaintiffs seek relief under Section 20(a) of the United States Securities and Exchange Act of 1934, and Section 10(b) of the Securities Exchange Act of 1934. *Id.*[3]  On January 12, 2009, Defendants filed this Motion to Compel Arbitration and to Dismiss pursuant to the Federal Arbitration Act, 9 U.S.C. § 1, *et seq.* and Fed. R. Civ. P. 12(b)(1). (Doc. No. 4.)

B.   Legal Standard

1.   Motion to Compel Arbitration

A motion to compel arbitration should be granted only where there is "'no genuine issue of fact concerning the formation of the agreement'" to arbitrate.  *Kirleis v. Dickie, McCamey & Chilcote,* 560 F.3d 156, 159 (3d Cir.2009) (quoting *Par-Knit Mills, Inc. v. Stockbridge Fabrics Co.,*

---

[3] Kyle Rosen did not participate in the removal of this case as Defendants do not recognize Kyle Rosen as a Defendant because Defendants contend that he has not been properly served in his individual capacity.  (Doc. No. 14 at 2, n.1.)  In response, Plaintiffs acknowledge that the certified mail sent to Kyle Rosen was returned, but they aver that when it was resent, the mail was then signed for. (Doc. No. 8-2 at 1-10.)  Plaintiffs' allege that the individual that signed for such certified mail was Kyle Rosen's "agent" under Pa. R. Civ. P. 401(a)(2)(iii) and his "authorized agent" under Pa. R. Civ. P. 403. (Doc. No. 20 at 9.)  Plaintiffs contend that service has been properly made pursuant to the Federal and Pennsylvania Rules of Civil Procedure. (Doc. No. 20 at 7-10.)  The Court, however, need not decide whether Kyle Rosen was properly served for the purposes of deciding the Motion to Compel Arbitration.

636 F.2d 51, 54 (3d Cir.1980)).  "In making this determination, the party opposing arbitration is entitled to 'the benefit of all reasonable doubts and inferences that may arise.'" *Id.*

2.     Motion to Dismiss

The Defendants have moved to dismiss the Plaintiffs' complaint in its entirety under Rule 12(b)(1).  Under Rule 12(b)(1), the movant makes either a facial or factual challenge to the court's subject matter jurisdiction.  *Patsakis v. Greek Orthodox Archdiocese of America*, 339 F. Supp.2d 689, 692 (W.D. Pa. 2004) (citing *Mortensen v. First Fed. Sav. & Loan Ass'n,* 549 F.2d 884, 891 (3d Cir. 1977).  In a facial attack, the court must consider the allegations of the complaint as true, similar to a motion to dismiss under Rule 12(b)(6).  *Mortensen,* 549 F.2d at 891; *Internat'l Ass'n of Machinists & Aerospace Workers v. Northwest Airlines, Inc.,* 673 F.2d 700, 711 (3d Cir. 1982). A factual challenge, however, goes to the court's power to hear the case:

> The factual attack . . . differs greatly for here the trial court may proceed as it never could under 12(b)(6) or Fed. R.Civ. P. 56. Because at issue in a factual 12(b)(1) motion is the trial court's jurisdiction [sic] its very power to hear the case [sic] there is substantial authority that the trial court is free to weigh the evidence and satisfy itself as to the existence of its power to hear the case.  In short, no presumptive truthfulness attaches to plaintiff's allegations, and the existence of disputed material facts will not preclude the trial court from evaluating for itself the merits of jurisdictional claims. Moreover, the plaintiff will have the burden of proof that jurisdiction does in fact exist.

*Mortensen,* 549 F.2d at 891 (citing 5 C. Wright and A. Miller, *Federal Practice and Procedure* § 1350 (1969)) (footnote omitted); *see also Hedges v. United States,* 404 F.3d 744, 750 (3d Cir. 2005) (citing *Kehr Packages, Inc. v. Fidelcor, Inc.,* 926 F.2d 1406, 1409 (3d Cir. 1991)).  Thus, in a Rule 12(b)(1) factual challenge, the court must ensure that its ruling is based on an adequate record.

4

*Internat'l Ass'n of Machinists & Aerospace Workers,* 673 F.2d at 711-12.  If a defendant presents evidence in the form of affidavits and/or documentary evidence challenging the jurisdictional allegations in the complaint, plaintiff must respond with affidavits or other sworn proof of his own to controvert the facts asserted by the defendant.  *Id.*

      C.     <u>Analysis</u>

         1.     Motion to Compel Arbitration

Defendants argue that Plaintiffs' claims are within the scope of the arbitration provision that is located within the Subscription Agreement, and that the Court should order the parties to arbitration and dismiss the case.  (Doc. No. 5 at 5-12.)  In opposition, Plaintiffs argue that the Limited Partnership Agreement (hereinafter the "LPA") supersedes the Subscription Agreement by operation of an integration clause, and that the Court should not order the parties to arbitration because the LPA does not contain an arbitration provision. (Doc. No. 8 at 2-13.)

The Federal Arbitration Act ("FAA") "'creates a body of federal substantive law establishing and regulating the duty to honor an agreement to arbitrate . . . .'" 9 U.S.C. § 1, *et seq.*; *John Hancock Mut. Life Ins. Co. v. Olick*, 151 F.3d 132, 136 (3d Cir. 1998) (quoting *Moses H. Cone Mem'l Hosp. v. Mercury Constr. Corp.*, 460 U.S. 1, 25 n.32 (1983)).  The FAA applies to written arbitration provisions contained in any contract evidencing a transaction involving interstate or foreign commerce, requiring that agreements to arbitrate be enforceable to the same extent as other contracts. 9 U.S.C. §§ 1, 2; *Harris v. Green Tree Fin. Corp.*, 183 F.3d 173, 178 (3d Cir. 1999).  The FAA also provides that  "[a] party aggrieved by the alleged failure, neglect, or refusal of another to arbitrate under a written agreement for arbitration may petition any United States District Court .

. . for an Order directing that such arbitration proceed in the manner provided in the agreement." 9 U.S.C. § 4.  Before a district court orders arbitration, however, the FAA requires the court to make the following threshold determinations: (1) whether the parties entered into a valid arbitration agreement; and (2) whether the specific dispute falls within the scope of that agreement.  *Olick*, 151 F.3d at 136 (explaining that a "district court need only engage in a limited review to ensure that the dispute is arbitrable").  A court may turn to "ordinary state-law principles that govern the formation of contracts" when determining whether the parties agreed to arbitrate.  *Kirleis*, 560 F.3d at 160 (quoting *First Options of Chic., Inc. v. Kaplan*, 514 U.S. 938, 944 (1995), and citing *Blair v. Scott Specialty Gases*, 283 F.3d 595, 603 (3d Cir. 2002)).  The FAA clearly reflects a "strong policy in favor of the resolution of disputes through arbitration." *Id.* (quoting *Alexander v. Anthony Int'l, L.P.*, 341 F.3d 256, 263 (3d Cir. 2003)).  "[T]his presumption in favor of arbitration 'does not apply to the determination of whether there is a valid agreement to arbitrate between the parties.'"  *Id.* (quoting *Fleetwood Enters., Inc. v. Gaskamp*, 280 F.3d 1069, 1073 (5th Cir. 2002)).

The first inquiry is whether a valid agreement to arbitrate exists between the parties.  The interpretation and construction of arbitration agreements are determined by reference to federal substantive law.  *Harris*, 183 F.3d at 179 (citing *Moses H. Cone*, 460 U.S. at 25, n.32).  Pursuant to section two of the FAA, however, federal courts may apply state law "'*if* that law arose to govern issues concerning the validity, revocability, and enforceability of contracts generally.'" *Doctor's Assoc., Inc. v. Casarotto*, 517 U.S. 681,685 (1996) (quoting *Perry v. Thomas,* 482 U.S. 483, 492 n.9) (emphasis added by *Perry* court); *Harris*, 183 F.3d at 179 (citing 9 U.S.C. § 2).  *See also Kirleis*, 560 F.3d 156 (court applied Pennsylvania law to determine whether parties agreed to arbitrate).  The parties agree that the law of Delaware should be applied to determine whether a valid agreement to

arbitrate exists.[4]

Under Delaware law, "it is an elementary canon of contract construction that the intent of the parties must be ascertained from the language of the contract." *Citadel Holding Corp. v. Roven*, 603 A.2d 818 , 822 (Del. 1992).  If no ambiguity is present, a court must give effect to the clear language within the contract. *Kaiser Aluminum Corp. v. Matheson*, 681 A.2d 392, 395 (Del. 1996). "A contract is not rendered ambiguous simply because the parties do not agree upon its proper construction.  Rather, a contract is ambiguous when the provisions in controversy are reasonably or fairly susceptible of different interpretations or may have two or more different meanings." *Id.*  In *Kaiser Aluminum*, the Supreme Court of Delaware held that when interpreting a contract, "[t]he true test is not what the parties to the contract intended it to mean, but what a reasonable person in the position of the parties would have thought it meant." *Id.*  Moreover, the meaning that should be attached to an unambiguous written instrument is that of "a reasonably intelligent person acquainted with all operative usages and knowing all the circumstances prior to and contemporaneous with the making of the instrument, other than oral statements by the parties of what they intended it to mean." *Interim Healthcare, Inc v. Spherion Corp*, 884 A.2d 513, 555 (Del. Super. 2005) (footnote omitted). Additionally, Delaware law requires that when "the ultimate purchaser of the securities is not a party to the drafting of the instrument which determines [his] rights, the reasonable expectations of the purchaser of the securities must be given effect." *Kaiser Aluminum Corp.*, 681 A.2d at 395.

This inquiry will require an examination of the LPA submitted by Plaintiffs and the Subscription Agreement submitted by Defendants.  On May 2, 2008, Plaintiff FFC, executed the first

---

[4] Both the Limited Partnership Agreement and the Subscription Agreement  contain a choice of law provision designating Delaware law as the applicable law. (Doc. No. 1-3 at 74.) (Doc. No. 4-2 at 11, 27, 43, 59.)

of four Subscription Agreements. (Doc. No. 4-2 at 5.)[5]  On July 25, 2008, Plaintiffs Fine FCA, Fine

FLP, and MFIF, each executed a separate Subscription Agreement. (Doc. No. 4-2 at 21, 37, 53.)  All

four of the identical Subscription Agreements contain an arbitration provision that provides in

pertinent part that:

> [a]ny controversy between Subscriber and the Fund or the General
> Partner involving the Fund, this Agreement, or the Limited
> Partnership Agreement shall be submitted to arbitration on the
> request of any party to any such controversy in the City and County
> of Los Angeles, California, or in the county and state in which the
> General Partner maintains its principal office at the time such request
> is made.  Any arbitration under this Agreement shall be conducted in
> accordance with the rules, then applying, of the American Arbitration
> Association ("AAA").  Any arbitration panel appointed by the AAA
> shall consist of at least three individuals, one of whom shall have
> experience in the securities business. . . . By signing this Agreement,
> Subscriber agrees to waive his or her right to seek remedies in court,
> including any right to a jury trial.

(Doc. No. 4-2 at 11, 27, 43, 59.)  Defendants aver that this provision is valid and that Plaintiffs are

bound by it, as all four Plaintiffs executed a Subscription Agreement containing the arbitration

provision. (Doc. No. 5 at 6-7.)

Plaintiffs acknowledge the existence of the arbitration provision, but argue that they are not

bound by it.  Plaintiffs maintain that their limited partnership interest in the Fund was not governed

by the Subscription Agreement because they contend that such agreement governed only an

investor's application to become an Investor in the Fund. (Doc. No. 8 at 5.)  Furthermore, Plaintiffs

argue that their interest in the Fund was solely governed by the LPA, which does not contain an

arbitration provision, but does contain an integration clause.  (Doc. No. 8 at 5-10.)

The integration clause within the LPA provides that "[t]his agreement constitutes the entire

---

[5] Close examination of all four of the Subscription Agreements reveals that they are identical.  Therefore,
throughout this discussion, reference will only be made to a single Subscription Agreement rather than to all four.

agreement and understanding among the parties hereto pertaining to the subject matter hereof and supersedes all prior and contemporaneous agreements and understandings of the parties hereto in connection herewith." (Doc. No. 1-3 at 75.)  Plaintiffs argue, without supporting authority, that such terms within the integration clause have subsequently caused the LPA to supersede the Subscription Agreement.  (Doc. No. 8 at 9.)  In response, Defendants argue that the LPA simply cannot supersede the Subscription Agreement because the Subscription Agreement was entered into after the LPA. Defendants aver that the LPA is dated July 1, 2005[6] and that all four Subscription Agreements were signed by Plaintiffs in 2008. (Doc. No. 5 at 12.)  Therefore, Defendants argue that the Subscription Agreement is not a prior or contemporaneous agreement in relationship to the LPA and thus, the integration clause does not cause the LPA to supersede the Subscription Agreement.

Furthermore, Defendants argue that since Plaintiffs did not execute the LPA,[7] Plaintiffs only became subjected to the LPA by executing the Subscription Agreement. (Doc. No. 14 at 3.) Defendants rely on the express terms within the Subscription Agreement to urge the Court to treat the LPA and the Subscription Agreement as one combined agreement.  *Id* at 2-3.  Such terms within the Subscription Agreement provide that:

> the following provisions, together with the Limited Partnership Agreement and the Private Placement Memorandum (the "*Memorandum*") of Rosen Capital Partners L.P., a Delaware limited partnership (the "Fund"), are the terms and conditions on which the investors in the Fund subscribe for limited partnership interests and apply to become Investors in the Fund.  Each prospective investor in the Fund accepts these terms and conditions by signing the signature page to such prospective investor's Confidential Investor Questionnaire (the "Questionnaire").  These terms and conditions are sometimes referred to, collectively with the Questionnaire, as the

---

[6] (Doc. No. 1-3 at 45-47.)

[7] (Doc. No. 1-3 at 76-77.)

"Agreement" or the "Subscription Agreement."

(Doc. No. 4-2 at 6, 22, 38, 54.)  Plaintiffs, after coming to a completely different interpretation of the effect of these terms, contend that these express terms support their argument that the Subscription Agreement was reached contemporaneously with the LPA.  Furthermore, Plaintiffs argue, without supporting authority, that the LPA precludes the application of the arbitration provision, as they consider the Subscription Agreement to be a  "contemporaneous agreement" under the meaning of the integration clause. (Doc. No. 8 at 9.)

Here, Plaintiffs signed the Subscription Agreement and not the LPA.  The Subscription Agreement is unambiguous, therefore, it is necessary to look at the clear language within such agreement to determine whether a valid agreement to arbitrate exists.  *See Kaiser Aluminum Corp.*, 681 A.2d at 395.  As mentioned above, the Subscription Agreement provides that "[e]ach prospective investor in the Fund accepts these terms and conditions by signing the signature page to such prospective investor's Confidential Investor Questionnaire (the "Questionnaire")." (Doc. No. 4-2 at 6, 22, 38, 54.)  As the arbitration provision is a condition within the Subscription Agreement, it appears that a reasonable person in the position of the Plaintiffs would have intended to be bound by the provision when they signed the signature page.  In addition, the language on the signature page which provides that "by signing below, the Investor agrees to become a Limited Partner in the Fund under the terms and conditions of the Fund's Limited Partnership Agreement, Private Placement Memorandum, and Subscription Agreement and all other applicable documents annexed thereto, which are incorporated herein by this reference," can not be ignored. (Doc. No. 4-2 at 4, 20, 36, 52.)  In light of these express terms, it appears that a reasonable person in the position of the Plaintiffs should have had reason to believe at the time they were executing the Subscription

10

Agreement, that they were bound to the terms within it and that the other documents, including the LPA could not supersede the Subscription Agreement.

Assuming that the arbitration provision is valid, the next inquiry is whether Plaintiffs' claims fall within the substantive scope of the provision.  Such inquiry is guided by a "presumption of arbitrability." *PaineWebber, Inc. v. Hartmann*, 921 F.2d 507, 511 (3d Cir. 1990), *overruled by implication on other grounds by Howsam v. Dean Witter Reynolds,* 537 U.S. 79, 85 (2002) (citing *AT & T Technologies v. Communications Workers of America,* 475 U.S. 643, 650 (1986)).  In addition, "[a]n order to arbitrate 'should not be denied unless it may be said with positive assurance that the arbitration clause is not susceptible of an interpretation that covers the asserted dispute.'" *Medtronic AVE, Inc. v. Advanced Cardiovascular Sys., Inc.,* 247 F.3d 44, 55 (3d Cir. 2001) (quoting *United Steelworkers of America v. Warrior & Gulf Navigation Co.,* 363 U.S. 574, 582-83 (1960)).

Plaintiffs' primary contention is that they suffered a substantial financial loss due to Defendants' failure to withdrawal Plaintiffs' investment in RCP. (Doc. No. 1-2 ¶¶ 16-19.) Specifically, Plaintiffs assert the following claims: (1) breach of contract; (2) breach of fiduciary duty; (3) negligence and gross negligence; (4) violation of section 10(b) of the Securities Exchange Act of 1934 and Rule 10b-5; (5) violation of 70 P.S. § 1-401, Pennsylvania Securities Act of 1972; and (6) violation of Section 20(a) of the Exchange Act. (Doc. No. 1-2.)

Defendants argue that all of Plaintiffs' asserted claims directly relate to and arise out of Plaintiffs' investment in the Fund and the parties' agreements concerning the Fund, and thus, are covered by the broad language within the arbitration provision. (Doc. No. 5 at 11.)  As Plaintiffs contend that a valid agreement to arbitrate does not exist, Plaintiffs do not present an argument directly in opposition to Defendants' argument that the claims are covered by the arbitration

11

agreement.  Plaintiffs argue, however, that their investment in the Fund is governed by the LPA and not the Subscription Agreement. (Doc. No. 8 at 5-10.)  Thus, it would logically follow that Plaintiffs appear to argue that their claims relating to the Fund are not within the scope of the arbitration agreement, as the LPA does not contain an arbitration provision.

The arbitration provision covers "[a]ny controversy between the Subscriber and the Fund or the General Partner involving the Fund, this Agreement, or the Limited Partnership Agreement." (Doc. No. 5 at 7.)  Courts have determined that language of an arbitration provision providing that "any controversy, claim or dispute arising out of or relating" is of the broadest nature. *TGM Health, Inc*. *v. UnitedHealth Group, Inc.,* Civ. A. No. 07-115, 2007 WL 1258133, at *1 (E.D. Pa. Apr. 27, 2007) (citing *Medtronic AVE, Inc. v. Cordis Corp.*, 100 Fed. Appx. 865, 868-69 (3d Cir. 2004)).

It appears that all of the claims relate to Defendants' failure to withdraw Plaintiffs' investment, and that such failure to act is covered by the broad language within the arbitration provision.  Thus, it necessarily follows that the order to arbitrate should be granted because the arbitration clause is susceptible to an interpretation that covers the asserted dispute.  *See Medtronic AVE, Inc.,* 247 F.3d at 55.  It is also worth noting that the United States Supreme Court has stated that "any doubts concerning the scope of arbitrable issues should be resolved in favor of arbitration, whether the problem at hand is the construction of the contract language itself or an allegation of waiver, delay or the like defense of arbitrability." *Moses H. Cone*, 460 U.S. at 24-25.

Plaintiffs argue that even if the Court finds that there is a valid arbitration agreement, the claims against three of the four Defendants would not be subject to the arbitration provision. (Doc. No. 8 at 3-13.)  Specifically, Plaintiffs contend that Defendants RCM, Kyle Rosen, and Panoptic did not sign the Subscription Agreement and thus can not be forced to arbitrate as they did not agree to

be bound by the arbitration provision. *Id.*

In response, Defendants rely on the language set forth in *Pritzker v. Merrill Lynch*, a case from the United States Court of Appeals for the Third Circuit in which the court held "that the arbitration clauses in the agreements . . . should be read to include all of the named defendants even though only one defendant signed them." 7 F.3d 1110, 1112 (3d Cir. 1993). Defendants also rely on *McLaughlin v. McCann*, a Delaware case that provides that "'courts have bound a signatory to arbitrate at the nonsignatory's insistence because of the close relationship between the entities involved, as well as the relationship of the alleged wrong to the nonsignatory's obligations and duties in the contract . . . and [because] the claims were intimately founded in and intertwined with the contractual obligations.'" 942 A.2d 616, 627, n.43 (Del. Ch. 2008) (quoting *Ishimaru v. Fung*, 2005 WL 2899680, at *18 (Del. Ch. Oct. 26, 2005)). Defendants argue that such a close relationship exists between the Defendants because RCM, Kyle Rosen, and Panoptic are all agents of the Fund and also, that the claims against such Defendants are based on the same intertwined conduct arising out of the same transaction and same documents. (Doc. No. 14 at 5-6.)[8]

In addition, Defendants argue that under Delaware law, the doctrine of equitable estoppel requires Plaintiffs to arbitrate all of their claims against Defendants, regardless of whether or not they signed the Subscription Agreement. (Doc. No. 14 at 6.) Defendants' argument is solely founded on *Wilcox & Fetzer Ltd. v. Corbett & Wilcox*, an unreported case that provides:

> application of equitable estoppel is warranted when the signatory to the contract containing an arbitration clause raises allegations of substantially interdependent and concerted misconduct by both the nonsignatory and one or more of the signatories to the contract. Otherwise, the arbitration proceedings between the two signatories

---

[8] Defendant RCM is the authorized and designated General Partner of the Fund. Defendant Kyle Rosen controls the management of the Fund, and Defendant Panoptic is the Fund's administrator. (Doc. No. 14 at 5.)

> would be rendered meaningless and the federal policy in favor of
> arbitration effectively thwarted.

Civ. A. No. 2037-N, 2006 Del. Ch. LEXIS 115 at * 16 (Del. Ch. Aug. 22, 2006) (court allowed the

nonsignatory to compel arbitration).

The Third Circuit has recognized that a party "can be compelled to arbitrate under an

agreement, even if he or she did not sign that agreement, if common law principles of agency and

contract support such an obligation on his or her part." *Bouriez v. Carnegie Mellon Univ.*, 359 F.3d

292, 294 (3d Cir.2004).  If in fact RCM, Kyle Rosen, and Panoptic are all agents of the Fund as

Defendants argue, then the principles of agency may be applied to allow them to arbitrate.  Plaintiffs

do not dispute the alleged agency relationship between the Defendants.  However, "an agent can

only be bound by the agreements of his principal when that principal acted with the agent's actual

implied or apparent authority." *Id.* at 294-95 (citing *Bel-Ray Co. v. Chemrite,* 181 F.3d 435, 445 (3d

Cir. 1999)).  In *Bel-Ray Co.*, the court relied upon *Thomas-CSF, S.A. v. American Arbitration Ass'n*,

64 F.3d 733, 776 (2d Cir.1995), wherein the court held that based on the common law principles of

contract and agency law, a non-signatory to an arbitration clause may be bound to arbitrate under

the following theories: (1) incorporation by reference; (2) assumption; (3) agency; (4) veil-

piercing/alter ego; and (5) estoppel.  *Bel-Ray Co.*, 181 F.3d at 446 (quoting *Thomas-CSF, S.A.,* 64

F.3d at 776).

Although RCM, Kyle Rosen, and Panoptic did not draft or sign the Subscription Agreement,

reference is made to all three Defendants throughout the agreement.  (Doc. No. 4-2 at 4-66.)

14

Throughout the Subscription Agreement, RCM is referred to as the "General Partner." *Id.*[9]  As the arbitration provision provides "[a]ny controversy between Subscriber and the Fund or the General Partner involving the Fund, this Agreement, or the Limited Partnership Agreement shall be submitted to arbitration on the request of any party," it is clear that RCM is intended to be bound by the provision as it is incorporated by the reference to the General Partner.  (Doc. No. 4-2 at 11, 27, 43, 59.)

Kyle Rosen and Panoptic are not directly referred to by name in the Subscription Agreement, but such agreement does make multiple references to "agents" of the Fund and the General Partner. As Kyle Rosen and Panoptic are agents of the Fund and General Partner, they are incorporated in the Subscription Agreement and thus within the reach of the arbitration provision.  (Doc. No. 4-2 at 4-66.)  Additionally, the well established policy favoring arbitration supports the argument that Kyle Rosen and Panoptic should be bound to the agreement under the circumstances in which they voluntarily want to arbitrate.  Furthermore, compelling Plaintiffs to arbitrate against all four Defendants is supported by the holding in *Barrowclough v Kidder, Peabody & Co., Inc.*, wherein the court ordered a signatory-employee and non-signatory co-plaintiffs to arbitrate against a signatory-employer and a non-objecting co-defendant that did not sign the arbitration agreement. 752 F.2d 923 (3d Cir.1985), *overruled on other grounds by Pritzker v. Merrill Lynch, Pierce, Fenner & Smith*, 7 F.3d 1110 (3d Cir.1993).

In addition to granting a stay and compelling arbitration where required by the FAA, a court in its discretion, may also dismiss the action instead of staying the case "[if] all the claims involved

---

[9] The term "General Partner" is frequently used within the Subscription Agreement, but it is made clear on page 23 of all four Subscription Booklets that RCM is the General Partner.  (Doc. No. 4-2 at 6, 22, 38, 54.)

in an action are arbitrable." *Berkery v. Cross Country Bank*, 256 F. Supp.2d 359, 364 (E.D. Pa. 2003) (citing *Seus v. John Nuveen & Co., Inc.,* 146 F.3d 175, 179 (3d Cir. 1998)).  The United States Court of Appeals for the Third Circuit, however, has held that even if all the claims involved are arbitrable, a district court does not have discretion to dismiss a case where one of the parties applies for a stay pending arbitration. *Lloyd v. Hovensa, LLC,* 369 F.3d 263, 269 (3d Cir. 2004).[10] Additionally, the Third Circuit Court of Appeals favors the granting of a stay as it "relieves the party entitled to arbitrate of the burden of continuing to litigate the issue while the arbitration process is ongoing, and it entitles that party to proceed immediately to arbitration without the delay that would be occasioned by an appeal." *Id.* at 270.  Such effects of a stay are created because "a district court's order compelling arbitration is usually an interlocutory order that cannot be appealed." *Id.* at 268. *See* 9 U.S.C. § 16 (b)(2).

Defendants have asked the Court in the alternative, to stay the litigation if the Court does not grant their Motion to Dismiss.  (Doc. No. 5 at 12-13.)  In support thereof, Defendants cite to the following language from § 3 of the FAA:

> if any suit or proceeding be brought in any of the courts of the United States upon any issue referable to arbitration under an agreement in writing for such arbitration, the court in which such suit is pending, upon being satisfied that the issue involved in such suit or proceeding is referable to arbitration under such agreement, shall on application of one or more of the parties stay the trial of the action until such arbitration has been had in accordance with the terms of the agreement.

9 U.S.C. § 3.  In light of such language within the FAA, and the fact that Defendants requested a stay in the alternative, a stay should be granted.  It is further recommended that the Court

---

[10] In *Lloyd*, the Court of Appeals held that the district court erred by not granting a stay where the defendant requested a stay within his motion to compel arbitration. *Lloyd*, 369 F.3d at 269.

administratively close the case so it will be taken off the active docket.

III.   <u>CONCLUSION</u>

For the reasons discussed above, it is respectfully recommended that the Motion to Compel Arbitration and to Dismiss at Doc. No. 4 be granted in part and denied in part.  It is recommended that the Motion to Compel Arbitration be granted and that Plaintiffs be ordered to arbitrate against all four Defendants.  It is further recommended that the Motion to Dismiss be denied, but that the case be stayed and administratively closed.

In accordance with the Magistrate Judges Act, 28 U.S.C. § 636(b)(1)(B) and (C), and Rule 72.1.4(B) of the Local Rules for Magistrate Judges, the parties are allowed ten (10) days from the date of service to file objections to this Report and Recommendation.  Any party opposing the objections shall have ten (10) days from the date of service of objections to respond thereto.  Failure to file timely objections may constitute a waiver of any appellate rights.


_____
LISA PUPO LENIHAN
United States Magistrate Judge


Dated: August 31, 2009


cc: The Honorable Nora Barry Fischer
    United States District Judge


    All Counsel of Record
    Via Electronic Filing

18